NOT FOR PUBLICATION
File Name: 04a0039n.06
Filed: October 22, 2004

No. 03-5316

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

GLENN HERMANN and KATHYRN
ELIZABETH SEGO, as Co-administrators
of the estate of Louis Wade Hermann,

                 Plaintiffs-Appellants,

v.

ROBIN COOK, KRISTIN ANDERSON,
JOHN TARTER, DAVID SANFORD, in
their individual capacities; and CITY OF
LOUISVILLE,

                 Defendants-Appellees.
_____/

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE WESTERN
DISTRICT OF KENTUCKY

BEFORE:    SUHRHEINRICH and BATCHELDER, Circuit Judges; and RICE, District
              Judge[*]

      **PER CURIAM.**  Plaintiffs Glenn Hermann and Kathryn Elizabeth Sego, co-administrators

of the estate of Louise Wade Hermann, appeal from the order of the district court granting summary

judgment on the basis of qualified immunity in this § 1983 action to Defendant Officers Robin

Cook, Kristin Anderson, John Tarter, and David Sanford, in their individual capacities, and the City

of Louisville.                **I.  Background**

      On September 16, 2000, the City of Louisville sponsored a free outdoor concert at the City's

Waterfront Park.  The downtown park is adjacent to the Ohio River.  A bystander informed Officer

_____

[*]The Honorable Walter Herbert Rice, United States District Judge for the Southern District
of Ohio, sitting by designation.

Kristen Anderson that Louis Wade Hermann was being disruptive. Upon determining that Hermann was drunk, Anderson asked Hermann to leave the concert, but he refused. Anderson arrested him and handcuffed his wrists behind his back.

Anderson needed an arrest slip, so she and Louisville Police Detective David Sanford walked Hermann to the westernmost pillar of a restaurant near the river's edge. Sanford kept custody of Hermann while Anderson left to obtain the slip. Sanford had Hermann sit down and cross his legs. Sanford said that Hermann appeared drunk. Anderson returned several minutes later, with Officer Robin Cook. Cook had Hermann stand up so she could pat him down. When she finished, Cook stepped off to one side and started chatting with Sanford's partner, Detective John Tarter.

While Officer Anderson completed paperwork, Hermann remained standing. He complained that his handcuffs were too tight, and Sanford loosened them. While still standing, Hermann asked, "Am I going to jail?" Anderson and Sanford answered yes. Immediately thereafter, Hermann sprinted towards the river. In Cook's words, "Mr Hermann bolted, I mean literally bolted, took off running as fast as he could northbound into the river." Sanford tried to grab Hermann but missed. The detective then chased Hermann, and Officers Anderson and Cook followed. When he realized what happened, Tarter also ran after Hermann.

Sanford and Anderson saw Hermann dive headfirst into the Ohio river. Cook thought he went in headfirst. Tartar, who was in the rear, thought that Hermann entered the river feet first. Hermann immediately disappeared under the surface of the water, and did not resurface.

Sanford immediately radioed LDP dispatcher and requested that EMS and the Fire & Rescue's dive team be sent to the scene. Tarter also radioed for assistance.

2

Tartar prepared to jump in the river after Hermann, but decided against it upon concluding that "it was very dangerous to do so." Sanford testified that he could not swim and had not been trained in river rescue. Cook testified that she is not a good swimmer and "wouldn't dare enter a river any way." Anderson testified that she too thought about jumping in, but that Hermann "went totally emerged [sic]," and couldn't been seen anymore."

Officer Ron Charles, a certified diver with the Fire & Rescue dive team, arrived on the scene sometime thereafter. He was on bike patrol and was not wearing his diving equipment. He waited for his equipment.

One of the concert goers, William Rainwater, told the officers that he had water rescue experience and offered to jump after Hermann. One of the officers told him to get way from the river. Rainwater claimed that the police officer "pushed me away and said, 'If you don't get out of here, I'm going to put your ass in jail.'" Rainwater also noted that there were life boats and life preservers nearby. Rainwater also testified that when he walked back over to the area where he had originally attempted to make a rescue, the male police officer who had previously told him to get away, was talking to another male officer who was preparing to go into the water: "Oh, don't bother; it's just another felon out of the way."

The EMS and the Fire & Rescue's dive team arrived about fifteen to twenty minutes after the incident. Charles assisted the rescue team in retrieving Hermann's body from the river.

Plaintiffs-Appellants Glenn Hermann and Kathyrn Sego, as co-administrators of Hermann's estate, filed suit against the City of Louisville under 42 U.S.C. § 1983, challenging the police officers' failure to attempt a rescue and prohibiting a private citizen rescue. The district court granted summary judgment to Defendants on qualified immunity grounds. This appeal followed.

3

This Court reviews a grant of summary judgment *de novo*. *Daughenbaugh v. City of Tiffin*, 150 F.3d 594, 597 (6th Cir. 1998). Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c).

To succeed on a § 1983 claim, a plaintiff must show that the defendants: 1) acted under color of state law; and 2) deprived the plaintiffs' decedent of his rights under the United States Constitution. *Cartwright v. City of Marine City*, 336 F.3d 487, 491 (6th Cir. 2003). Only the second element is at issue in this case.

On appeal, Plaintiffs argue that Defendants' failure to rescue violated Herman's Fourteenth Amendment substantive due process rights. Plaintiffs' failure to rescue claim fails. As this Court recently observed in a similar case:

> The problem with this is that no constitutional right to state-provided rescue services exists. The Supreme Court has expressly held that the Due Process Clause confers "no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." *DeShaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189, 196 (1989). It follows that "[i]f the Due Process Clause does not require the State to provide its citizens with particular protective services, . . . the State cannot be held liable under the Clause for injuries that could have been averted had it chosen to provide them." *Id.* at 196-197. The district court thus acted properly in dismissing the portions of the instant complaint that were based on the asserted right to state-sponsored assistance.

*Beck v. Haik*, No. 99-1050, 2000 WL 1597942 (6th Cir. Oct. 17, 2000).

In attempting to establish a duty, Plaintiffs rely on two well recognized exceptions to *DeShaney*, "where a person suffered injuries either while in state custody or because of state acts

4

that made him more vulnerable to private violence." *See Cartwright*, 336 F.3d at 491.  However, we agree with the district court that neither exception applies in this case:

> Here, the Court finds neither a special relationship which restrained Hermann so as to expose him to harm, nor any affirmative conduct on Defendants' part placing him in greater danger.  Defendants held Hermann in custody in an entirely appropriate manner.  Neither Hermann's conduct nor the circumstances required the need for greater restraint; Defendants took no affirmative action to place him in greater danger.  Nor can anyone reasonably say that Defendants caused the kind of "special danger" which the Sixth Circuit has said is necessary to create an affirmative duty.  Only Hermann's unexpected attempted escape and dash into the Ohio River created the circumstances of his death.

*Hermann v. Cook*, 240 F. Supp.2d 626, 630-31 (W.D. Ky. 2003) (citation omitted).

Plaintiffs' reliance on *Davis v. Brady*, 143 F.3d 1021 (6th Cir. 1998), is misplaced.  In *Davis*, police officers responded to a mission's request for protection from Davis' drunk and disorderly conduct. The officers arrested Davis for intoxication and disorderly conduct and brought him to the Flint police station.  They transferred him to the county jail, but that facility was full.  The desk sergeant told the officer to release Davis as he was not so drunk as to be a hazard to himself.  The officers handcuffed Davis, put him in the back of the squad car, and drove Davis to a location outside the city limits, where they left him near a road with a 55-mile-per-hour speed limit.  *Id*. at 1023. Davis walked to nearby houses, called and met with another police officer, then returned to the roadway, where he was hit by a car and seriously injured.  The *Davis* court found that *DeShaney* was not dispositive because "[u]nlike the situation in *DeShaney*, . . . the defendant officers in this case placed Davis in a more dangerous situation than he was prior to their interference, when they drove him outside the Flint city limits and abandoned him on a dark and dangerous highway in an unfamiliar area." *Id.*

Although the defendant officers in this case likewise took Hermann into custody, they did nothing affirmative to place Hermann in harm's way, like dropping him off along a busy highway, knowing that he was in an inebriated state. Rather, they had handcuffed him, and there were four officers nearby. The officers are not to be faulted for failing to anticipate Hermann's affirmative act of attempting to escape. *Cf. Cartwright,* 336 F.3d at 491 (holding that officers did not have a duty to protect a pedestrian who was struck and killed by a truck, where the officers smelled alcohol, but did not notice other signs of intoxication, and where decedent told the police officers that he did not want a ride, so they left him at a convenience store, which he subsequently left and was run over by truck); *Foy v. City of Berea*, 58 F.3d 227 (6th Cir. 1995) (holding that police officers had not violated the plaintiff's due process rights although they ordered the drunken plaintiff off the premises and he got into a car accident forty-five minutes later, because they had not restrained his liberty, and had not caused him to take the trip that resulted in his death).

Plaintiff further argues that the police breached their duty of care because they made no efforts to rescue Hermann, even though the water equipment was available, and in refusing to allow a private citizen from attempting a rescue, even in the face of police inaction. As noted above, no constitutional right to state-provided rescue services exists. However, this Court has, in one instance, held that official action preventing rescue attempts by volunteer civilian divers can be unconstitutional. *See Beck*, 2000 WL 1597942, at *3-4. *See also Ross v. United States*, 910 F.2d 1422 (7th Cir. 1990) (reversing a grant of summary judgment entered in favor of the city because the plaintiff sufficiently alleged that the county arbitrarily denied the plaintiff's decedent Fourteenth Amendment right to life by virtue of its anti-private rescue policy).

6

In *Beck* we concluded that there was a genuine issue of fact as to whether a state actors violated the deceased's constitutional rights by preventing volunteer divers from attempting a timely rescue. The decedent, Eugene Beck, jumped or fell into the Manistee River. Personnel from the Manistee police department, fire department, and sheriff's department dive team were dispatched to the scene. City police officers reached the scene within two or three minutes, but the county dive team did not arrive until nearly fifty minutes after the 911call. Two members of the Manistee Search and Rescue Dive Team heard the incident report and arrived at the scene within minutes. The MSRDT is a group of trained civilian divers under contract with the City of Manistee to provide rescue and recovery services when the county dive team was unable to respond. They volunteered to attempt a rescue. However, the officers at the scene ordered them to stay out of the water, pursuant to a county policy against private rescue efforts. The county dive team did not arrive until some thirty minutes after the volunteer divers could have been in the water searching for the deceased. The plaintiffs alleged that the police officers knew or should have known that the county dive team would not arrive for some time. The *Beck* court concluded that the plaintiffs stated a claim on these facts, and reversed the district court's grant of summary judgment. *Beck*, 2001 WL 1597942, at ** 1-4.

*Beck* is factually distinguishable. There, the police knew that the volunteer divers were trained civilian divers, and members of a dive team that was under contract with the city.[1] Here, by

---

[1]*Beck* was decided approximately one month after the date on which the events in the case *sub judice* transpired, and therefore it cannot be said that the right to be free from police interference with private rescue on the facts *of this case* was a clearly established right such that the officers would not be entitled to qualified immunity. "Qualified immunity is an affirmative defense that shields government officials performing discretionary functions from liability for civil damages insofar as their conduct does 'not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Sheets v Mullins*, 287 F.3d 581, 586 (6th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

contrast, the officers knew nothing of Rainwater's purported qualifications. Indeed, in his affidavit, Rainwater acknowledged that "[t]hough I am not trained in underwater rescue, I am certified to perform CPR and I have extensive experience swimming and diving in dark water." Under these circumstances, Defendants' refusal to allow Rainwater to attempt a rescue does not state a claim. As we observed in *Beck*: "If police officials are not satisfied that would-be rescuers are equipped to make a viable rescue attempt, for instance, it would certainly be permissible to forbid such an attempt. It would not be irrational, similarly, to prohibit private rescue efforts when a meaningful state-sponsored alternative is available." *Id.* at *4.

Thus, as the district court concluded:

> One can certainly debate about the best course of action for the police and bystanders to have taken. Reasonable arguments might support a decision for any number of possible actions. That is the judgment call which the officers must make on the scene. Whether additional efforts would have actually proved successful or would only have cost the lives of police officers or bystanders can never be known. What is absolutely clear is that the Defendants did not violate Hermann's constitutional rights by making the reasonable judgment that neither they nor innocent bystanders should attempt a rescue before trained personnel arrived. For these reasons, Plaintiff's federal claims against the individual Defendants must be dismissed.

*Hermann*, 240 F. Supp.2d at 631 (footnote omitted).

## III.

In sum, we affirm the judgment of the district court, although for slightly different reasons. We hold that the grant of summary judgment as to Defendants was proper, because they did not owe a constitutional duty to Hermann. Thus, we need not reach the question of qualified immunity. Plaintiffs' remaining claims were also properly dismissed. **AFFIRMED.**